**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| **JANE DOE** | * | |
| **Plaintiff,** | * | |
| | * | **Civil Case No.: SAG-23-2899** |
| **v.** | * | |
| | * | |
| **BALTIMORE CITY BOARD OF SCHOOL COMMISSIONERS** | * | |
| | * | |
| **Defendant.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Plaintiff Jane Doe ("Plaintiff") brings this action against her former employer, Baltimore City Board of School Commissioners ("Defendant" or "City Schools"), alleging failure to accommodate, discrimination in hiring, and retaliation in violation of the Americans with Disabilities Act ("ADA"). ECF 22 (the Amended Complaint). The parties have filed cross-motions for summary judgment, ECF 63, 65, to which each have filed their respective opposition and replies. ECF 65, 71, 73. This Court has reviewed the filings and has determined that no hearing is necessary to resolve the motions. *See* Loc. R. 105.6 (D. Md. 2023). For the reasons explained below, Defendant's motion will be granted in part and denied in part, Plaintiff's motion will be denied, and judgment will be entered for Defendant on Plaintiff's discrimination and retaliation claims.

## I.    FACTUAL BACKGROUND[1]

### *Plaintiff's City Schools tenure prior to and in early stages of central office role*

Plaintiff began her tenure with City Schools in June 2011 as a special educator; a few years later, she was selected as a resident principal. ECF 63-1 at 7; ECF 65-1 at 4; ECF 63-3, Plaintiff's Deposition ("Pl. Dep.") at 15–16, 18. While serving as the principal at the ███████████ ██████, Plaintiff was physically assaulted by a student in ██████████. In addition to physical injuries to her neck and back, the assault precipitated Plaintiff being diagnosed with post-traumatic stress disorder ("PTSD"), anxiety, and depression. ECF 63-1 at 7; ECF 65-1 at 4; ECF 63-3 (Pl. Dep.) at 19–22. During the rest of her tenure as principal of ████████████████ ███████████, Plaintiff did not request any accommodations. ECF 63-1 at 8; ECF 65-1 at 5 (Plaintiff stating that her first request for reasonable accommodation was on November 17, 2020).

In 2020, after discussions with Dr. Sonja Santelises (City Schools' Chief Executive) and Supervisor (████████████████████████████████████████████████████████████████████████████), Plaintiff applied for the position of Director-Level Position A ██████████████. ECF 63-1 at 8–9; ECF 63-3 (Pl. Dep.) at 30, 35; ECF 63-9 (November 23, 2020 City Schools notice regarding reorganization of Human Capital Office); ECF 63-10 (Santelises Dep.) at 35–36. After a final interview with Chief HCO (the Chief Human Capital Officer in the Human Capital Office) and Supervisor in September 2020, Plaintiff was appointed to the position on October 14, 2020. ECF 63-1 at 9–10; ECF 63-11 (Microsoft Teams Meeting notice for September 4, 2020 interview); ECF 63-9 (Nov. 23, 2020 Notice of Plaintiff's appointment). In this position,

---

[1] For pincites, in all instances where an ECF header is affixed to the top of a page, this Court uses the ECF page number in that header; where such headers are *not* affixed, this Court uses the page numbers of the underlying document.

Plaintiff reported directly to Supervisor, who himself reported to Chief HCO, who himself reported to Dr. Santelises. ECF 63-1 at 10 (citing ECF 63-12 ("Organizational Structure")).

At the time, the T&O Dept. "le[d] the district's strategy around . . . staff leadership." ECF 63-7 (Job description for the "Director-Level Position A" position) at 2. The Educator Pipelines and Induction team was formed "to plan and execute strategies and activities to build stronger, equity-centered talent pipelines and robust supports for teachers and principals in the first years in role." ECF 63-9 (Notice of appointment) at 1. Among an extensive list of "Performance Responsibilities: Essential Functions" listed in the job description for the Director position, Defendant has highlighted the following:

- Translates cross-departmental human capital strategy into specific, prioritized plans and actions for the Educator Pipelines and Induction unit, guiding staff to maintain clear links between their responsibilities, actions, and performance and the Human Capital Office's strategic plan and results.

- Creates and monitors an annual calendar of pipeline-building and induction program activities, ensuring that participants and their supervisors have clear understanding of program components and objectives.

- Prepares materials for and delivers presentations to key stakeholder groups regarding principal pipelines, teacher pipelines, principal induction, and teacher induction. This includes facilitating decision-making processes with senior leaders (e.g., chief officers) and adapting project plans based on their decisions.

- Recommends new approaches, policies, and procedures to effect continual improvements in efficiency of department and services performed.

- Ability to remain flexible in a creative and challenging work environment.

- Excellent interpersonal and organizational skills with demonstrated ability to identify, prioritize, organize tasks in order to efficiently and effectively accomplish assigned and self-generated tasks.

- Demonstrated ability to work collaboratively with teams and independently.

ECF 63-7 (Job description) at 2–5; ECF 63-1 at 9.[2] Defendant asserts that, "very early in her tenure" in her new position, Plaintiff's performance was impacted by her "lack of central office experience" which "manifested in her asking her supervisors—Supervisor, Chief HCO, and Dr. Santelises—for a disproportionate amount of support." ECF 63-1 at 10 (citing ECF 63-5 (Chief HCO Dep.) at 67–68; ECF 10 (Santelises Dep.) at 31–33). The existence—or not—of strategic plans, and Plaintiff's responsibilities regarding creation versus implementation of such plans, was a particular point of disconnect between Plaintiff and her supervisors. *See* ECF 63-1 at 10–11; ECF 63-13 (October 30, 2020 email to Supervisor and Chief HCO) at 1; ECF 63-15 (November 17, 2020 email to Supervisor) at 1; ECF 63-10 (Santelises Dep.) at 47–48, 67–69.[3]

***Plaintiff informs supervisors of medical conditions***

On November 17, 2020, in the course of an exchange regarding an assignment, Plaintiff emailed to Supervisor, "I suffer from chronic depression and anxiety, and last-minute directives and unclear expectations trigger panic attacks." ECF 63-15 at 2. Plaintiff requested scheduled "triad meetings" between herself, Supervisor, and Chief HCO "for effective communications and clear expectations of desired outcomes," and a "transition plan template" to identify "[r]ealistic timeline expectations." *Id.*; ECF 65-1 at 6. In response, Supervisor asked Plaintiff to elaborate on how she would manage her depression and anxiety in her new work

---

[2] While Defendant characterized these as "essential functions and skills" of the position, citing to the job description, ECF 63-7, that document actually reflects that the last three items in Defendant's list appear not in the list of "Essential Functions," but in a list of "Additional Skills and Experiences We Seek." ECF 63-7 (Job description) at 4–5.

[3] Defendant notes that "[t]he Office of Human Capital as a whole, . . . adopted a comprehensive three-year strategic plan in 2019." ECF 63-1 at 10 n.2 (citing ECF 63-14 (Office of Human Capital April 21, 2021 Powerpoint) at 2). Plaintiff has asserted that "in October 2020, she immediately requested the strategic plans she expected to implement, and Chief HCO apologized for the 'miscommunication' about their existence." ECF 65-1 at 10 (citing ECF 63-13). However, the word "miscommunication" does not appear in the cited October 30, 2020 email exchange.

environment, and what her "accommodation and contribution need to now encompass," noting the "pace, ambiguity, complexity and adaptive challenges that encumber this work, role, and larger Human Capital team." *Id.* Plaintiff then stated she could "only authentically respond" to ▆ Supervisor with guidance she had received when working at the school level, which included (1) providing the employee suffering from depression or anxiety with an "Employee Assistance Brochure," and (2) "[l]earn[ing] more about the disability so that you can adjust and respond to the employee's needs, if possible." *Id.* at 1. She further stated that "clear expectations, answering the BART questions,[4] not withholding information, and being transparent about strategic plans and the identified outcomes in advance are vital pillars for any employee's success, with or without depression & anxiety." *Id.* As for her own actions, Plaintiff stated that she was currently seeing a therapist and that "[a] part of my plan is to advocate for my needs and the structures required to succeed in this role." *Id.*

### *Plaintiff's requests for medical leave and reasonable accommodations*

In November 2020, ▆▆▆▆▆▆ Plaintiff applied for intermittent leave under the Family and Medical Leave Act ("FMLA"). Her request was granted in early December for the period of November 30, 2020 through May 30, 2021. ECF 63-1 at 12 n.4; ECF 65-1 at 7; ECF 63-22. Plaintiff also requested and was granted *continuous* FMLA leave for the period of March 3 through April 17, 2021; she ultimately took continuous leave from March 4 through April 18, 2021. ECF 63-1 at 14; ECF 63-26; ECF 65-1 at 25.

---

[4] Defendant represents that a "BART"—an acronym for "Boundary, Authority, Role, and Task"—is an organizational document, and that Supervisor drafted one on November 25, 2020. ECF 63-1 at 12; ECF 63-17.

On December 22, 2020, Plaintiff emailed Courtney Calhoun, City Schools' Equal Employment Manager / Title IX Coordinator, to formally request reasonable accommodations under the ADA. ECF 63-1 at 12; ECF 65-1 at 6; ECF 63-20; ECF 63-21; ECF 63-31. As accommodations for her PTSD, anxiety, and depression, which she represented affected job duties of "last-minute tasks/expectations," "completion of tasks with unclear next steps," decreased work productivity," "decreased energy to concentrate," "completion of tasks," and "memory retrieval," Plaintiff requested that supervisors provide "[c]lear expectations, realistic deadlines, clear & effective communication, [f]lexible schedule, . . . instructions & expectations in written form, goal oriented management method, [and] work from home or isolated space." ECF 63-21 at 1. That same day, Mr. Calhoun attempted to provided certain paperwork to Plaintiff for her to have her doctor complete, to "assist in a your [sic] approval of the accommodation decision." ECF 63-1 at 13; 63-23 at 2 (Screenshot of Dec. 22, 2020 email from Mr. Calhoun to Plaintiff, contained within Mar. 1, 2021 email from Plaintiff to Jane Ehrenfeld). However, he sent the email to an incorrect email address for Plaintiff, leaving a single letter off of the domain name. *Id.*[5]

No further action was taken regarding Plaintiff's ADA accommodations request until Plaintiff followed up with Mr. Calhoun on March 1, 2021, requesting paperwork for her physician. ECF 63-1 at 13; ECF 65-1 at 6; ECF 63-20 at 1; ECF 63-23 at 2; ECF 65-4 ("Calhoun Interview," dated Jan. 6, 2022). While Mr. Calhoun had been unaware that Plaintiff had not received his

---

[5] In her motion for summary judgment, Plaintiff describes the error as a *representation* by Defendant, and states, "Defendant's discovery productions contain no evidence of any email delivery failure notification or 'bounceback' message. The only evidence produced is a screenshot provided by Mr. Calhoun to Plaintiff showing the misspelled email address." ECF 65-1 at 6 n.4. However, Plaintiff accepted this representation in 2021 (*see* ECF 63-23 at 2 (attaching screenshot) ("Mr. Calhoun did send this form back in December, but left the (m) off .com. Despite the error, I am grateful that I saw his attempt.")). *See also* ECF 63-3 (Pl. Dep.) at 52 ("He spelled my email address incorrectly and he forgot to put the M on dot com, so I never received the information from him.").

December 22, 2020 email, he later stated that it had been his responsibility to follow up with Plaintiff. ECF 65-1 at 7; ECF 65-4 ("Calhoun Interview") at 1. A few minutes after receiving Plaintiff's follow-up email, Mr. Calhoun re-sent the paperwork. ECF 63-1 at 14; ECF 63-20. Plaintiff appears to have returned the completed paperwork on June 4, 2021. ECF 63-1 at 15; ECF 63-23; ECF 65-1 at 35. After discussions between Mr. Calhoun, Plaintiff, and Supervisor regarding proposed accommodations, *see* ECF 63-1 at 15; ECF 63-30; ECF 63-31, on June 22, 2021, Mr. Calhoun issued a "Determination" letter regarding her request to the Equal Educational/Employment Opportunity and Title IX Compliance Unit (the "EEO Unit") for reasonable accommodations pursuant to the ADA. The letter outlined the following "agreed-upon accommodations," "based on [Plaintiff's] position ▮▮▮▮-Level Position A ▮▮▮▮," which were to be in place for the subsequent six months:

> **Clear Expectations**: If new primary or process tasks are introduced to the employee's portfolio of work, then you and your supervisor will participate in a collaborative conversation to align on expectations, resources, constraints, expectations, outcomes, timelines, and progress monitoring. You may choose to use this tool to both facilitate a conversation and generate written documentation towards clearer expectations. [Hyperlink]
>
> **Project Management**: You and your supervisor will create a project plan for all projects. [Hyperlink] The purpose of this plan is to:
> - Clearly define roles
> - Break up the project into smaller component pieces, if necessary
> - Negotiate and agree upon a timeline for completion
> - Track progress on the project
> - Ensure integration of racial equity throughout
>
> **Clear and Effective Communication**: The supervisor and the employee will engage in collaborative conversation to agree on expectations, keep the lines of communication open, and create accountability at the outset. This resource may assist the employee in managing upward on a project or responsibility that is new in nature: [Hyperlink]

ECF 63-32; ECF 63-1 at 15–16; ECF 65-1 at 7. Chief HCO was not provided a copy of the Accommodations Determination until July 27, 2021. ECF 63-1 at 16; ECF 65-1 at 7; ECF 63-43.

7

***Plaintiff's performance—including interaction with supervisors—in her central office role, and alleged violations of accommodations***

While Defendant, through the affidavit of Supervisor, has represented that a "performance review conversation" was held between Supervisor and Plaintiff on June 15, 2021, and that Supervisor gave Plaintiff a rating of "meets expectations," there was no written documentation of that evaluation, purportedly due to Supervisor's computer crashing. ECF 63-1 at 16; ECF 65-1 at 9; ECF 63-35 ("Supervisor Aff."). Thus, Plaintiff asserts that she "received no formal evaluation between July 2020 and December 2021." ECF 65-1 at 9 (citing ECF 63-57 (Report prepared by Shawe Rosenthal for EEO Investigation ("EEO Report")). Further, she asserts that "[t]he record is devoid of any formal reprimands, Performance Improvement Plans, or documented disciplinary actions against Plaintiff during her fourteen-year tenure with Baltimore City Public Schools." ECF 65-1 at 5.

Defendant highlights a number of email exchanges occurring between December 2020 and February 2021—*prior* to approval of her accommodations—that it argues "demonstrate that Plaintiff was not efficiently or effectively advancing the work for which she was responsible," "required a disproportionate amount of assistance from her supervisors," and "continued to push back against clear directives given to her by Supervisor and Chief HCO ." ECF 63-1 at 10, 13 (citing ECF 63-18, ECF 63-19, ECF 63-24; ECF 63-25). Defendant, further, cites deposition testimony from Dr. Santelises in which she described having provided Plaintiff with outsized support. Dr. Santelises also testified that Plaintiff had offered "subpar work" in a presentation. ECF 63-1 at 10, 17–18; ECF 63-10 (Santelises Dep.) at 32–38, 73–74.

Plaintiff asserts that she "submitted accommodation-related complaints to the EEO Unit on August 5, October 15, October 28, and December 9, 2021." ECF 65-1 at 8 (citing ECF 63-57

(EEO Report) at 13). The following events allegedly occurred between August and November, 2021:

- As part of an August 5, 2021 email exchange regarding Plaintiff's handling of an assignment request, Plaintiff shared a link to an article regarding toxic work environments, which Plaintiff stated "helps to crystalize the experiences I have endured since my arrival." ECF 63-16 at 4. Chief HCO responded by suggesting that he and Plaintiff "have a conversation about whether you believe this role and team are the right fit for you." *Id.* "Plaintiff immediately forwarded Chief HCO's response to City Schools' Director of Fair Practices & Compliance—Jane Ehrenfeld, Esq.—requesting a 'private consultation to flag [her] concerns.'" ECF 63-1 at 19 (citing ECF 63-45). Plaintiff specifically flagged Chief HCO's statement about fit as "an example of my accommodations being neglected." ECF 63-45 at 3. Ms. Ehrenfeld met with Plaintiff the next day, August 6, 2021. ECF 63-1 at 19 (citing ECF 63-45).

- After another email exchange in mid-August, 2021 between Plaintiff and Supervisor, in which Plaintiff, responding to Supervisor's suggestion of a "reflection moment," stated that his behavior was "beginning to feel abusive," ECF 63-1 at 19; ECF 63-44, Plaintiff, Supervisor, and Chief HCO engaged in a "triad meeting" on August 27, 2021. ECF 63-1 at 20. After the meeting, Plaintiff asked Chief HCO if she "could reconsider your option to report to someone else." ECF 63-1 at 20; 63-42 at 1.

- At 10:50 a.m., on October 6, 2021, Chief HCO asked Plaintiff to provide him with certain information by noon. ECF 63-1 at 20; ECF 65-1 at 8; ECF 63-46 at 2. While Plaintiff completed the task, she experienced a panic attack. ECF 65-1 at 8; ECF 63-3 (Pl. Dep.) at 180–81.

- Later in October 2021, other requests were directed to Plaintiff which she characterized as "last minute tasks that violated the prohibition on assigning work without collaborative planning." ECF 65-1 at 8. These included:

    1) a request on October 7 for information, with a deadline of October 11;

    2) a request on October 12, 2021 for assistance, with a same-day deadline, which Plaintiff completed within two hours;

    3) a request on October 14 from Chief HCO for portions of a Title II application, with an "ASAP" turnaround, to which Plaintiff responded that she was "unable to meet my deadline with having this completed because I am continuously being pulled to achieve lagged deadlines," and "ha[d] to request more streamlined communication and outcomes due to [her] accommodations"; and

    4) a request on October 20 at 12:41 a.m. from Supervisor for review and revision to a draft, with a deadline of 10:00 a.m. that morning, which Plaintiff responded to with input at 9:15 a.m.

    ECF 63-1 at 20; ECF 65-1 at 8; ECF 63-57 (EEO Report) at 8–9; ECF 63-47. On October 15, 2021, Plaintiff reached out to Mr. Calhoun regarding (1) updates to or extension of her approved accommodations, and (2) the process for handling violations of those accommodations. ECF 63-1 at 21; ECF 63-48.

- "On October 28, 2021, Plaintiff informed Calhoun she was receiving tasks with same-day deadlines in violation of her accommodations, which was triggering panic attacks." ECF 65-1 at 8 (citing ECF 63-57 (EEO Report) at 12).
- Plaintiff and Chief HCO had a check-in meeting on November 8, 2021 regarding Plaintiff's accommodations. ECF 63-1 at 21; ECF 65-1 at 8–9.

### *Conclusion of Plaintiff's tenure at the central office and reassignment*

On December 1, 2021, Chief HCO and Plaintiff had a check-in meeting, at which Chief HCO informed Plaintiff that he and Supervisor would be leaving City Schools and would be replaced on an interim basis by Sarah Diehl and Monica Logan, respectively. ECF 63-1 at 21–22. The same day, Plaintiff formally requested an extension of her ADA accommodations. ECF 63-1 at 25; ECF 65-1 at 5; ECF 63-59. On December 9, 2021, in an email thread including Plaintiff, Chief HCO Supervisor, Ms. Diehl, and Ms. Logan, Chief HCO opined on a number of points, including the regularity of supervisor meetings and other aspects of the supervisor relationship for Plaintiff and Ms. Diehl going forward. Chief HCO also "clearly and directly ma[de] an offer" "to create an additional Senior Principal Coach position specifically for [Plaintiff] to fill." ECF 63-1 at 22; ECF 63-53. After Plaintiff responded taking exception to Chief HCO's sharing of confidential information, Chief HCO responded that he had "serious concerns at this point about [Plaintiff's] ability to effectively serve in this role," and changed the focus of a meeting, scheduled for the following day, to this topic. ECF 63-53 at 3–4. Plaintiff responded that she would like to have "representation in the room to support" her; she later requested that her current supervisor be present at the next day's meeting and that her future supervisors not be. *Id.* at 2–3. Chief HCO responded that the decision as to the attendees at the meeting was his to make, and stated, "Frankly, your continued questioning of a decision that the chief officer has made is itself significant evidence of the problem with fit and performance." *Id.* at 2; ECF 63-1 at 22–23; ECF 65-1 at 10.

In a later email thread on December 9, 2021, Chief HCO reiterated that the purpose of the next day's meeting would be for him "to communicate [his] serious concerns at this point about [Plaintiff's] ability to effectively serve in this role." Plaintiff responded, "This feels abusive and grounded in retaliation," and stated that she would attend the meeting if she was "emotionally present." ECF 63-1 at 23; ECF 63-54; ECF 65-1 at 5. Plaintiff "immediately forwarded this exchange" to Mr. Calhoun. ECF 65-1 at 5; ECF 63-31 (Calhoun Timeline) at 2.

At a meeting held the next day, December 10, 2021, Chief HCO informed Plaintiff that she was to be reassigned to a new position. ECF 63-1 at 24; ECF 65-1 at 5. According to a letter addressed to Plaintiff from Chief HCO, dated December 10, 2021, Plaintiff was being reassigned because she had "not effectively performed the duties of the Director-level role" and had "demonstrated that this role is not an appropriate fit." ECF 63-55.

The letter did not identify a new position for Plaintiff, nor did it identify a date by which that decision would be made. *Id.*; ECF 65-1 at 11; ECF 65-1 at 11. Plaintiff was not placed in a new role, that of "Director-Level Position B," until 14 months later, in late February, 2023. ECF 63-1 at 25; ECF 65-1 at 11; ECF 63-63 (Notification of reassignment). Her salary was not reduced (and had not been throughout the duration of her pending reassignment), and she was approved for updated accommodations.[6] ECF 63-1 at 25 (citing ECF 63-62 (Grant of accommodations); ECF 63-63 (Notification of reassignment); ECF 63-3 (Pl. Dep.) at 82–83; ECF 63-64). Plaintiff asserts, without supplying evidence, that during the interim period before her

---

[6] These included "one meeting per week with your immediate supervisor . . . to discuss position responsibilities and progress in implementing those responsibilities," "a quiet workspace," and "reasonable break time." ECF 63-62.

reassignment, she "lost her PSASA affiliation[7] and ███ award winner ███ designation." ECF 65-1 at 11.

### *EEO investigation and subsequent reviews of reassignment decision*

On December 11, 2021, Plaintiff filed a complaint with City Schools' EEO Unit. ECF 63-1 at 24; ECF 63-56. City Schools engaged a private law firm to complete an EEO investigation. ECF 63-1 at 24 (citing ECF 63-57 (EEO Report)). On January 27, 2022, City Schools notified Plaintiff of the investigative findings, including that **Chief HCO**, Supervisor, and Ms. Diehl did not violate City Schools policies and did not discriminate, harass, or retaliate against Plaintiff, and that the December 10, 2021 reassignment and suspension of Plaintiff's access to City Schools' systems did not constitute retaliation. ECF 63-1 at 25 (citing ECF 63-58 (Determination Letter)). In the same Determination Letter, Defendant, "recogniz[ing] [Plaintiff's concern about the reference to performance issues in [the December 10, 2021] letter," said it would "revise and reissue the December 10, 2021 letter to remove any reference to your performance or fit for the position." ECF 63-1 at 25; ECF 65-1 at 11–12; ECF 63-58 at 1; ECF 63-68 (Revised Reassignment Letter). Plaintiff emphasizes that the EEO report noted that the investigators were unable to determine whether Plaintiff's perceived performance issues, including in her interactions with others, were the manifestation of her disability. ECF 65-1 at 10 (citing ECF 63-57 (EEO Report) at 14). Plaintiff appealed the reassignment decision to the Baltimore City Board of School Commissioners, which affirmed the decision. ECF 65-6. Plaintiff then appealed that decision to the Maryland State Board of Education ("MSBE"). ECF 65-8. On February 28, 2023, the MSBE, apparently with nothing in the record identifying Plaintiff's new position following the

---

[7] The acronym refers to the Public School Administrators & Supervisors Association of Baltimore City ("PSASA").

reassignment (despite Plaintiff having been sent a notice of reassignment on February 9, 2023 (ECF 63-63)), held that the matter was "not ripe for review until the reassignment to another position has occurred." ECF 65-9 at 1. The MSBE did find, however, that "[i]t exceed[ed] the limits of the local Superintendent's authority to place a transferred employee into a 'yet to be determined position' for an indefinite waiting period," in this case, "over two school years," and ordered that Defendant identify a new position for Plaintiff within 45 days. *Id.* at 1–2

## II.   LEGAL STANDARD

Both parties seek summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure. That rule provides that summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden of showing that there is no genuine dispute of material fact. *See Casey v. Geek Squad*, 823 F. Supp. 2d 334, 348 (D. Md. 2011) (citing *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987)). If the moving party establishes that there is no evidence to support the non-moving party's case, the burden then shifts to the non-moving party to proffer specific facts to show a genuine issue exists for trial. *Id.* The non-moving party must provide enough admissible evidence to "carry the burden of proof in [its] claim at trial." *Id.* at 349 (quoting *Mitchell v. Data Gen. Corp.*, 12 F.3d 1310, 1315–16 (4th Cir. 1993)). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find in its favor. *Id.* at 348 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)). Moreover, a genuine issue of material fact cannot rest on "mere speculation, or building one inference upon another." *Id.* at 349 (quoting *Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999)).

13

Additionally, summary judgment shall be warranted if the non-moving party fails to provide evidence that establishes an essential element of the case. *Id.* at 352. The non-moving party "must produce competent evidence on each element of [its] claim." *Id.* at 348–49 (quoting *Miskin*, 107 F. Supp. 2d at 671). If the non-moving party fails to do so, "there can be no genuine issue as to any material fact," because the failure to prove an essential element of the case "necessarily renders all other facts immaterial." *Id.* at 352 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Coleman v. United States*, 369 F. App'x 459, 461 (4th Cir. 2010) (unpublished)). In ruling on a motion for summary judgment, a court must view all of the facts, including reasonable inferences to be drawn from them, "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)).

"When faced with cross-motions for summary judgment, the court must review each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (internal quotation marks omitted); *see also Kantsevoy v. LumenR LLC*, No. ELH-17-359, 2019 WL 1441982, at *6 (D. Md. Apr. 1, 2019). In considering each motion, the court should "resolve all factual disputes and any competing, rational inferences in the light most favorable to the party opposing that motion." *Defs. of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Rossignol*, 316 F.3d at 523). If the court finds that there is a genuine issue of material fact, both motions must be denied; but the court will render judgment if there is no genuine issue of material fact and "one or the other party is entitled to prevail as a matter of law." *Kantsevoy*, 2019 WL 1441982, at *6 (citation omitted).

### III.    DISCUSSION

Plaintiff's amended complaint includes three Counts: Count I (Failure to Accommodate), Count II (Discrimination in Hiring), and Count III (Retaliation). Each is addressed in turn below.

#### A. Failure to accommodate (Count I)

"To survive summary judgment" on a failure to accommodate claim under the ADA, "a plaintiff must show (i) she was disabled, (ii) the employer had notice of her disability, (iii) she could perform the essential functions of her position with a reasonable accommodation, and (iv) the employer refused to make such accommodation." *Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 378 (4th Cir. 2022). There is no dispute among the parties as to Plaintiff's disability. It is also undisputed that Defendant *did* approve accommodations for Plaintiff in June, 2021. Nevertheless, Plaintiff rests her failure-to-accommodate claim on two bases:

First, Plaintiff claims that *violations* of her granted accommodations constituted a "failure to accommodate." ECF 22 at 23. Only Defendant has sought summary judgment on this theory of liability.

Second, however, Plaintiff asserts that the *delay* between her first request for accommodations and the ultimate approval of those accommodations constituted a "failure to accommodate." Both parties seek summary judgment as to the delay theory. This Court will proceed chronologically and address it first.

#### 1.  The Alleged Delay in Provision of Accommodations

Both parties seek summary judgment on Plaintiff's failure-to-accommodate claim on the question of whether the period between Plaintiff's notice to Defendant of her requested accommodations and the ultimate provision of those accommodations constituted an unreasonable delay and a *de facto* denial of accommodations. Because the parties do not dispute that Defendant

15

was given notice of Plaintiff's disability and request for accommodation, this Court need only examine the third and fourth elements of Plaintiff's prima facie case. It will begin with the fourth element; namely, whether the alleged delay amounted to a *refusal* by Defendant to make reasonable accommodations.[8]

"[W]hile 'employers need not immediately implement or accept accommodations proposed by an employee' and need not move 'with maximum speed in addressing a request for accommodations,' an 'unreasonable delay in providing an accommodation for an employee's known disability can amount to a failure to accommodate.'" *Marshall v. Univ. of Md. Med. Ctr.*, No. TDC-17-2779, 2020 WL 5106788, at *7 (D. Md. Aug. 31, 2020) (quoting *Farquhar v. McCarthy*, 814 F. App'x 786 (4th Cir. 2020) (unpublished per curiam) (internal quotation marks and citations omitted) (discussing a failure to accommodate under the Rehabilitation Act)), *aff'd*, No. 20-2067, 2023 WL 3018424 (4th Cir. Apr. 20, 2023) (unpublished per curiam). In considering whether a delay in provision of accommodations is so unreasonable as to constitute a *denial* of those accommodations, "[a] relatively short delay of a few weeks (or even a few months) in approving a request typically does not support such a claim." *Smith v. CSRA*, 12 F.4th 396, 415 (4th Cir. 2021) (Rehabilitation Act case) (quoting *Marks v. Wash. Wholesale Liquor Co.*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017)) (alteration in *Smith*). However, "[i]n making a determination about the unreasonableness of a delay, '[n]o hard and fast rule will suffice.'" *Marshall*, 2020 WL 5106788, at *7 (quoting *Crabill v. Charlotte Mecklenburg Bd. of Educ.*, 423 F. App'x 314, 323 (4th Cir. 2011) (internal quotation marks and citations omitted)) (second alteration in *Marshall*). "Courts instead consider the length of the delay, the reasons for the delay, whether the employer

---

[8] As discussed within this Court's analysis of Plaintiff's *violations*-based failure-to-accommodate claim, Defendant does not contest the reasonableness of Plaintiff's accommodations.

has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith." *Id.* at \*7 (citing *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262–63 (10th Cir. 2001)). This analysis requires an inquiry into whether the employer and employee engaged in an interactive process to identify limitations resulting from the disability and potential reasonable accommodations.

While the parties do not dispute that Defendant was given notice of Plaintiff's disability and desire for accommodation, they do dispute the specific date and form of that notice. Consequently, the length of the delay in providing accommodations is also in dispute. Plaintiff argues that her November 17, 2020 email to Supervisor provided the requisite notice for her claim; thus, the delay between request and approval would be seven months. Defendant counters that the email, while mentioning her disabilities, did not provide sufficient notice that she was *requesting reasonable accommodations.* Thus, Defendant argues it did not have adequate notice until Plaintiff submitted a formal request to Defendant's EEO Unit on December 22, 2020, *six* months before her accommodations were approved.

Regardless of the precise length of the delay, Plaintiff asserts that it was "caused entirely by Defendant's administrative failures" beginning in December, 2020. Specifically, she asserts (1) that Mr. Calhoun's misspelling of Plaintiff's email address, and consequent failure to provide necessary paperwork to Plaintiff for more than three months before the error was discovered on March 1, 2021, delayed action on Plaintiff's accommodations request for that time, and (2) that because of *that* delay, she suffered "panic attacks that would have been mitigated by approved accommodations," and was consequently "forced onto continuous FMLA [leave] from March 4 through April 18, 2021," further delaying the approval of her accommodations. ECF 65-1 at 25. But looking at the timeline detailed in the statement of facts, it is clear that *both* parties contributed

17

to the delay. While an employer may be liable under the ADA for failure to engage in the interactive process, "a reciprocal obligation is assumed by the employee; employers are not responsible when a breakdown of the interactive process 'is traceable to the employee and not the employer.'" *Strife v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 246 (5th Cir. 2025) (quoting *Loulseged v. Asko Nobel, Inc.*, 178 F.3d 731, 736 (5th Cir. 1991)); *see also Dressel v. Safeway, Inc.*, No. ELH-19-1556, 2021 WL 2291806, at *9 (D. Md. June 4, 2021) ("The responsibility to engage in the interactive process is '*shared* between the employee and the employer.'") (quoting *Loulseged*, 178 F.3d at 736) (emphasis in *Loulseged*); *Tarquinio v. Johns Hopkins Univ. Applied Physics Lab*, No. RDB-23-0727, 2024 WL 1604493, at *4 (D. Md. Apr. 11, 2024) ("[B]oth the employer and employee have a duty to participate in the interactive process in good faith; an *employer* may not be held liable for failing to provide a reasonable accommodation where the *employee* refused to engage in or caused the breakdown of the interactive process.") (emphasis in original).

Defendant's primary contribution to the delay, as stated by Plaintiff, was that at no point after Mr. Calhoun believed he had sent Plaintiff the required paperwork on December 22, 2020 did Mr. Calhoun or anyone at City Schools follow up with Plaintiff about her accommodations request. Rather, it was only when Plaintiff followed up with Mr. Calhoun on March 1, 2021 that the interactive process resumed. In the interactive process, where necessary "missing information is of the type that can only be provided by one of the parties, failure to provide the information may be the cause of the breakdown and the party withholding the information may be found to have obstructed the process. The determination must be made in light of the circumstances surrounding a given case." *Beck v. Univ. of Wisc. Bd. of Regents*, 75 F.3d 1130, 1136 (7th Cir. 1996). Here, Mr. Calhoun's attempted but unsuccessful delivery of the required paperwork to Plaintiff resulted in each party, in their mind, waiting on missing information from the other.

18

The Fourth Circuit's analysis in *Murphy v. County. of New Hanover*, No. 21-1471, 2021 WL 4704780 (4th Cir. Oct. 8, 2021) (unpublished per curiam), is somewhat persuasive. The Fourth Circuit held that a two month delay in providing requested accommodations was not unreasonable where it was attributable, in part, to a human resources employee's failure (an "oversight," as she testified) to attach necessary paperwork to an email to the plaintiff, and to the plaintiff's failure to follow up for nearly three weeks after receiving the deficient email. *Id.* at *2. In so holding, the Fourth Circuit rejected the plaintiff's assertion that the human resources employee's negligence constituted a bad faith failure to engage in the interactive process. *Id.*

Here, Plaintiff failed to follow up for more than two months after submitting her formal accommodations request, a much longer period. However, whereas in *Murphy* the plaintiff had received an email referring to attachments that were simply not there, in the instant case, Plaintiff received no email to which there might be a similar expectation of a follow-up. As for Mr. Calhoun, Plaintiff has specifically cited to an "Interview," dated January 6, 2022, in which Mr. Calhoun apparently "conceded that it was his responsibility to follow up with [Plaintiff.]" ECF 65-4 at 1.

After she *did* receive the necessary paperwork from Mr. Calhoun on March 1, 2021, however, Plaintiff did not submit it to Defendant until June 4, 2021, *more than three months later*. Plaintiff asserts that six weeks of that delay was attributable to her being forced to take continuous FMLA leave *due to* the lack of accommodations. Even were this Court to accept this factually unsupported assertion, it does not explain why, upon return from that FMLA leave on April 18, 2021, Plaintiff took another nearly seven weeks to submit the paperwork. Thus, a substantial portion of the breakdown of the interactive process was traceable to Plaintiff. *See Beck*, 75 F.3d at 1136. This District and others have held that where the delay is attributable to the plaintiff employee's failure to engage, the delay was not unreasonable. *See Marshall*, 2020 WL 5106788,

at *8 (holding that "no reasonable jury could conclude that [defendant] failed to participate in the interactive process in good faith such that the six-month delay amounted to a failure to accommodate," where "the length of that [interactive] process was attributable in part to delays caused by [plaintiff] and her physician in responding to [defendant's] inquiries."); *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 71–74 (D.D.C. 2019) (Rehabilitation Act case) (holding that a six-month delay in providing accommodation (new computer equipment) was reasonable where, among other things, the employee had been on medical leave for six weeks of the six-month period and did not pick up the new equipment immediately), *appeal dismissed*, No. 19-5182, 2019 WL 7602215 (D.C. Cir. Dec. 30, 2019).

Plaintiff's inaction contributed significantly to the delay in the approval of her requested accommodations; thus, this Court cannot conclude, viewing the facts in the light most favorable to Defendant, that no reasonable juror could find the delay to have been reasonable. However, neither can this Court say, viewing the facts in the light most favorable to Plaintiff, that no reasonable juror could find that Defendant's failure to follow up with Plaintiff until she took action on March 1, 2021 amounted to a denial of accommodations in that time. A genuine dispute exists as to the length and reasonableness of the delay.

The remaining element of Plaintiff's prima facie case is whether she could perform the essential functions of her position during the relevant time (November 2020 through June 2021) with reasonable accommodations. "If the plaintiff cannot perform the essential functions of the job, with or without reasonable accommodation, then she is not a 'qualified individual' under the ADA and therefore has no legal entitlement to an accommodation.'" *Tartaro-McGowan v. Inova Home Health, LLC*, 91 F.4th 158, 165 (4th Cir. 2024) (citing 42 U.S.C. §§ 12111(8), 12112(b)(5)(A)). Because Plaintiff was *granted* reasonable accommodations in June, 2021, this

20

Court need not speculate as to whether Plaintiff would have been able to perform the essential functions of her job with reasonable accommodations, it can simply consult the record pertaining to Plaintiff's job performance after the implementation of her accommodations.

Defendant has cited testimony from Plaintiff's supervisors offering negative assessments of Plaintiff's job performance during her tenure in her Central Office position. *See* ECF 71 at 13–14; ECF 63-35 (Supervisor Aff.) (stating that Plaintiff, throughout her tenure, had difficulty approaching issues "from the enterprise or systems-level view," "demonstrating key leadership competencies," "integrat[ing] feedback or consider[ing] alternate viewpoints," and "build[ing] shared understanding and foster[ing] effective cross-functional teamwork," all of which "are essential to the role of Director-Level Position A ."); ECF 63-5 (Chief HCO Dep.) at 107–08 (when asked for examples of when Plaintiff was unable to perform effectively, Chief HCO stated that Plaintiff was "not able to effectively" "develop and design, lead and manage, monitor and adjust the scope of work assigned to the team that she led."); ECF 63-10 (Santelises Dep.) at 52, 65–66 ("[W]hen we talk about [Plaintiff's] performance, there's a higher level of political acumen, of management expertise that you have to be able to display and exhibit in high levels").

"A plaintiff's success or failure on this element" of a failure-to-accommodate claim "turns on 'just what the essential functions of [the plaintiff's] position [are].'" *Tartaro-McGowan*, 91 F.4th at 165 (quoting *Elledge v. Lowe's Home Ctrs., LLC*, 979 F.3d 1004, 1009 (4th Cir. 2020)). "In determining which job functions are essential, the ADA instructs that 'consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.'" *Champ v. Baltimore*

*Cnty.*, 884 F. Supp. 991, 997 (D. Md. 1995) (quoting 42 U.S.C. § 12111(8)), *aff'd*, 91 F.3d 129

(4th Cir. 1996) (unpublished per curiam).

Defendant acknowledges that Plaintiff "may have completed certain discrete tasks," but

asserts that Plaintiff demonstrated an inability to perform multiple specific functions from the job

description for Plaintiff's position as ████ Director-Level Position A ████. Defendant

highlights that the job description specified that the position holder would "[t]ranslate[] cross-

departmental human capital strategy into specific, prioritized plans and actions for the Educator

Pipelines and Induction unit," and  "[p]repare[] materials for and deliver[] presentations to key

stakeholder groups . . . . This includes facilitating decision-making processes with senior leaders .

. . and adapting project plans based on their decisions." ECF 71 at 13 (quoting ECF 63-7 (Job

description) at 2–3); ECF 63-1 at 28–29 (quoting same). Defendant asserts that "[t]he record is

replete with examples of Plaintiff demonstrating an inability to create strategic plans for her

department, present effectively before key stakeholders (including the CEO), and adopt project

plans based on the decisions of chief officers (including **Chief HCO**)." ECF 71 at 13.[9]

Notably, though, the majority of the evidence that Defendant cites to in support of this statement

---

[9] Defendant also asserts—in fact, this is the *primary* example they offer in their motion of Plaintiff's inability to perform—that Plaintiff was unable to "remain flexible in a creative and challenging work environment." ECF 63-1 at 29 (quoting ECF 63-7 (Job Description) at 5), and that "[t]his lack of flexibility continued even after Plaintiff's accommodations were in place." ECF 63-1 at 29. This Court notes, first, that the "[a]bility to remain flexible" was *not* listed among the "Essential Functions" in the job description but, rather, was among a list of "Additional Skills and Experiences We Seek." But moreover, the concept of "flexibility" is one of inherently subjective assessment; thus, this Court cannot conclude, on this basis, that, even if it were considered an essential function of her position, no reasonable juror could find Plaintiff was able to perform. For example, among the examples of this alleged "inflexibility" that Defendant highlights—though from prior to Defendant's grant of accommodations, is Plaintiff's request, after **Supervisor** asked her to reschedule her June, 2021 evaluation meeting to two hours earlier, to "stick to the recommended time." *See* ECF 63-1 at 29 (quoting ECF 63-67). Surely, even if the vague directive to "remain flexible" was considered an essential function of Plaintiff's position, that function could not be reasonably construed to require that Plaintiff acquiesce to every rescheduling request.

(ECF 63-13 at 1; ECF 63-15 at 3; ECF 63-19 at 1–4; ECF 63-25 at 2–7) pre-dates June, 2021, and so does not necessarily speak to how Plaintiff could perform essential functions *with* accommodations.

It is Plaintiff's "burden to establish[] [her] ability to perform the essential functions of [her] job with a reasonable accommodation." *Fleetwood v. Hartford Sys., Inc.*, 380 F. Supp. 2d 688, 697 (D. Md. 2005). Plaintiff's brief argument in her cross-motion on this point does not identify any "essential functions" of her position; she simply asserts that that, after approval of her accommodations, she "successfully completed assignments, including time-sensitive Board requests,"[10] and highlights that Supervisor, on June 15, 2021, rated her performance as "meets expectations." ECF 65-1 at 25; *see also* ECF 63-35 (Supervisor Aff.) ¶ 6.

The "meets expectations" rating was issued *a week before* Plaintiff's accommodations were approved, on June 22, 2021. Nevertheless, it remains compelling evidence of Defendant's assessment of Plaintiff's job performance for purposes of her *prima facie* case; the rating was issued after Plaintiff had been in her role for nearly eight months, in which time she had taken both intermittent and continuous FMLA leave and had already demonstrated many of the behaviors and approaches that Defendant now cites as evidence of her inability to perform the essential functions of her position. If, notwithstanding that performance and evidence, Defendant still gave Plaintiff a rating of "meets expectations," a reasonable juror could conclude that Plaintiff was continuing

---

[10] Looking at Plaintiff's "Statement of Facts" in her cross-motion, the only post-June, 2021 assignments that she highlights are also those "last-minute tasks" which she alleges *violated* her accommodations' "prohibition on assigning work without collaborative planning," including a "Board-requested task" on October 6, 2021 and an "ESSA Consolidated Strategic Plan task" on October 12, 2021. ECF 65-1 at 8; *see also* ECF 63-46 at 2; ECF 63-57 (EEO Report) at 8. Thus, while Plaintiff may cite her completion of these assignments as evidence of her ability to perform the essential functions of the job with accommodations, they, in fact, by Plaintiff's telling, demonstrate her ability to perform those functions in spite of her accommodations not being honored.

to "meet expectations" with the benefit of her accommodations, particularly when the asserted deficiencies in her performance were not formally raised at any point after her accommodations were approved. The record does not reflect that Plaintiff was counseled for performance deficiencies or placed on a PIP between the provision of her accommodations and her December 10, 2021 reassignment.

To demonstrate she was able to perform the essential functions of their position—and thus, was a "qualified individual" under the ADA—"all that is required is that the plaintiff establish basic eligibility for the position at issue, and not the greater showing that [she] satisfies the employer." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001), *as amended* (June 6, 2001). "When the question [of a plaintiff's ability to perform essential functions] is . . . a matter of degree . . . a plaintiff fails to perform the essential function only if her failure detrimentally affects the purpose of the employment." *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 279–80 (4th Cir. 2004) (where actress's PTSD and depression affected her ability to interact with others—an essential function of her job—"to some extent," and primarily in "one, narrow aspect of her job" (offstage interactions), the court was unwilling to find that plaintiff could not perform that essential function). *See also Searls v. Johns Hopkins Hosp.*, 158 F. Supp. 3d 427, 437 (D. Md. 2016) (holding, in assessing whether requested accommodations were reasonable, that deaf plaintiff, with the aid of an interpreter, "could perform a *substantial portion* of the essential job functions of communicating and responding to alarms . . . so that her inability to hear did not detrimentally affect the purpose of employing her as a nurse"; thus, her request for a full-time ASL interpreter was reasonable) (emphasis added). Here, the nature of the essential functions of Plaintiff's position raises questions of *degree* of performance, as opposed to *ability* to perform. And the record reflects that questions of "fit," many stemming from Plaintiff's apparent

24

misconceptions of her job responsibilities, were the primary concern. Indeed, ⬛Chief HCO⬛ testified at his deposition that "while there were some concerns about performance, they were coupled with a much more serious mismatch in terms of fit." ECF 63-5 at 106. The factual question of how questions about "fit" factor into an assessment of ability to perform essential functions is one better reserved for the jury.

Having found genuine disputes as to multiple elements of Plaintiff's prima facie case for her failure-to-accommodate claim as it pertains to the alleged delay in provision of accommodation, this Court will deny both parties' motions for summary judgment on that issue.

2. **Alleged violations of Plaintiff's accommodations.**

This Court need not undertake a separate analysis of the first three required elements for Plaintiff's prima facie claim of failure to accommodate based on post-approval violations. For the reasons stated above, this Court finds no dispute as to Plaintiff's demonstration of her disability and Defendant having been on notice of her disability,[11] and finds a genuine dispute as to Plaintiff's ability to perform the essential functions of her position with reasonable accommodation.

---

[11] Defendant, in seeking judgment on Plaintiff's claim specifically as it pertains to her allegations of violations of her approved accommodations, has argued that Plaintiff must, and has failed to, show that Defendant had sufficient notice not only of Plaintiff's disability, but *also of the alleged violations*. *See* ECF 63-1 at 27–28 (quoting *Henson v. Balt. City Bd. of Sch. Comm'rs*, No. ADC-23-0004, 2023 WL 2992727, at *5 (D. Md. Apr. 18, 2023) ("Even if Defendant did violate the accommodation, Plaintiff would be precluded from bringing the claim as she has not pleaded that she informed Defendant that the accommodation was, in her view, being violated or that she needed a more specific accommodation.")). More accurately, Defendant, while acknowledging that "Plaintiff was in regular contact with several members of City Schools' EEO Unit" regarding alleged violations, nevertheless asserts that there is no evidence that she alleged violations of her accommodations by ⬛Chief HCO⬛ "with sufficient specificity." ECF 63-1 at 28 (citing ECF 63-5 (⬛Chief HCO⬛ Dep.) at 52; ECF 63-10 (Santelises Dep.) at 60). It is not clear from where Defendant draws this requirement of "sufficient specificity" for allegations of violations; there is no case law cited in support, and Defendant does not, itself, define the term. By any definition, though, Plaintif's August 5, 2021 complaint to Ms. Ehrenfeld in the EEO unit would certainly suffice as notice of alleged violations. ECF 63-45 at 3 ("Below is an example of my accommodations being neglected . . .").

As for the fourth factor—whether Defendant effectively refused to provide Plaintiff with accommodations through its violations of Plaintiff's approved accommodations—the parties offer completely different assessments of the record. Defendant insists there is not "even a scintilla of evidence suggesting that Chief HCO violated [Plaintiff's] accommodation," ECF 63-1 at 30; Plaintiff counters that her accommodations were "systematically violated." ECF 65-1 at 34. Where the facts lie between these two extreme assertions is a question best settled by a jury. Defendant argues that "[t]he record is . . . replete with examples of Chief HCO . . . providing outsized support, offering coaching, participating in meetings, and developing communication strategies to ensure that Plaintiff was properly accommodated." ECF 63-1 at 30–31. However, the exhibits Defendant cites do not merit such a conclusion and are insufficient to support awarding judgment to Defendant on Plaintiff's failure-to-accommodate claim.

Plaintiff has raised the following events as examples of Defendant's "systemic[] violat[ion]" of her accommodations:

- On July 19, 2021, after Plaintiff completed an assignment from Chief HCO for written presentation on NTC budget issue, Chief HCO "demanded revisions due July 20," a one-day deadline. ECF 65-1 at 7 (citing ECF 65-6 at 5; ECF 63-38 at 3; ECF 63-27 at 3);[12]

- "On August 25, 2021, Plaintiff's request for clarification went unanswered for 39 days." ECF 65-1 at 34;

- "On October 6, 2021, Chief HCO sent Plaintiff an email at 10:50 AM with a Board-requested task requiring a noon deadline[;] . . . [d]espite completing it on time at 12:04 PM, Plaintiff experienced a panic attack." ECF 65-1 at 8 (citing ECF

---

[12] In opposing Defendant's motion on the violations-based failure-to-accommodate claim, Plaintiff refers to having received assignments with one-day deadlines "[o]n July 14, and July 20, 2021." ECF 65-1 at 34. This Court will treat this statement as being in reference to the July 19–20 events. Moreover, this Court rejects Defendant's argument that Chief HCO could not have violated Plaintiff's accommodations during this time frame because he had not been made aware that they had been approved. The issue is whether Defendant, not Chief HCO, accommodated Plaintiff's disability, and a jury should decide whether the failure to promptly communicate the approved accommodations up the supervisory chain constituted a failure to accommodate.

63-46 at 2; ECF 63-3 (Pl. Dep.) at 180–81); ECF 65-1 at 34. "The assignment violated the accommodation's requirement for collaborative conversation to align on expectations, resources, constraints, outcomes, and timelines." *Id.* (citing ECF 63-32);

- "On October 7, 2021, Ronda Lasko assigned Title II monitoring information with a Monday, October 11, deadline." ECF 65-1 at 8 (citing ECF 63-57 (EEO Report) at 8);

- "On October 12, 2021, Kasey Mengel assigned an ESSA Consolidated Strategic Plan task Supervisor failed to complete, with a same-day deadline. Plaintiff completed it within two hours." ECF 65-1 at 8 (citing ECF 63-57 (EEO Report) at 8);

- "On October 14, 2021, Chief HCO assigned portions of a Title II application due to Mengel's last-minute request"; in response, "Plaintiff explicitly stated: 'I have to request more streamlined communication and outcomes due to my accommodations.'" ECF 65-1 at 8 (citing ECF 63-47);

- "On October 20, 2021, Supervisor emailed Chief HCO and Plaintiff at 12:41 AM requesting agenda revisions due at 10:00 AM." ECF 65-1 at 8 (citing ECF 63-57 (EEO Report) at 9).

Plaintiff has not cited any record evidence pertaining to the purported "request for clarification" on August 25, 2021, and there is no other mention of this event in either her cross-motion or her reply. Thus, this "violation" cannot be considered.

As for the remainder, Defendant argues generally that Plaintiff's accommodations requiring "collaborative conversation to align on expectations, resources, constraints, expectations, outcomes, timelines, and progress monitoring" applied only where "new primary or process tasks" were "introduced to [Plaintiff's] portfolio of work," and not to "discrete assignments related to work *previously* introduced to Plaintiff's portfolio of work." ECF 71 at 52 (emphasis added). However, Defendant's only evidence of this interpretation comes from ██ Chief HCO's deposition testimony explaining *his* understanding of the accommodation, *see* ECF 63-5 at 118–20, and Defendant does not make any argument as to whether the specific assignments and timelines that Plaintiff has highlighted would or would not constitute violations

of her accommodations under that interpretation. The nature of the assignments, whether Plaintiff's accommodations, consequently, applied to them, and whether the length of the required timelines for their completion violated those accommodations are all disputes of fact best resolved by a jury.

Defendant also argues that, contrary to Plaintiff's argument that "Defendant took no corrective action" in response to her "formal complaints," ECF 65-1 at 35, the EEO unit "continued to support Plaintiff after her accommodations were originally approved," and that Chief HCO invited Plaintiff to "text him" if she had difficulty reaching him. While the record does suggest that Plaintiff met with Ms. Ehrenfeld and Mr. Calhoun on multiple occasions, and Chief HCO at least once, to discuss her accommodations and/or allegations of violations, this, without evidence of some further action in response to those allegations, is not enough to entitle Defendant to judgment on Plaintiff's violations-based failure-to-accommodate claim.

When interviewed as part of the EEO investigation of Plaintiff's formal complaint after her removal from the Director position, Chief HCO said, "it would be impossible to comply [with Plaintiff's approved accommodations] 100% of the time given the dynamic nature of the job" and that the accommodations were "untenable." ECF 63-6 at 2. This assessment of the feasibility of compliance would be relevant if Defendant were challenging the reasonableness of the requested accommodations. But the problem for Defendant is that it approved these accommodations, without challenging their reasonableness or meaningfully seeking to modify them. *See* ECF 65-4 (January 6, 2022 Calhoun Interview) at 2 ("Calhoun described the determination letter and accommodation as a 'win-win for everyone' and that it was 'masterful' and an 'excellent response to the situation.'"); ECF 63-57 (EEO Report) at 3). The accommodations that Defendant approved appear to be broad enough in nature ("clear

28

expectations," "clear and effective communication") to lend themselves readily to invocation and, thus, assertions of violation. A genuine dispute exists as to whether Defendant violated these accommodations; thus, this Court will deny Defendant's motion for summary judgment regarding Plaintiff's violations-based failure-to-accommodate claim.

### B. Discrimination in Hiring

Both parties seek summary judgment on Plaintiff's claim for discrimination in hiring, but their analyses do not neatly align. In Count II of her Amended Complaint, Plaintiff expressly referenced the following events as bases for her claim for "discrimination in hiring": (1) Defendant's failure to hire Plaintiff into new positions for which she applied and was qualified, negatively affecting her professional development, ECF 22 ¶¶ 139, 141; (2) Defendant's requirement of reviewing Plaintiff's medical information and records before placing her in a new position (e.g., Director-Level Position C ), and threats of demotion or placement in lower position if she declined to provide them, ECF 22 ¶¶ 140, 142–45; (3) Defendant's rescission of an offer to Plaintiff for the Director-Level Position C , after Plaintiff's acceptance, ECF 22 ¶ 146; and (4) Defendant's eventual placement of Plaintiff in the Director-Level Position B , "an ad hoc position outside of the District Headquarters with no department, no firm funding, [and] no opportunities for advancement." ECF 22 ¶ 147.

In its motion for summary judgment, Defendant reduces Plaintiff's claim to two theories: "(A) Defendant discriminated against [Plaintiff] by requiring that she provide updated medical information and (B) Defendant discriminated against her by reassigning her to the role of Director-Level Position B ." ECF 63-1 at 31. It seeks summary judgment on both theories, arguing that (1) requiring Plaintiff to submit updated medical information prior to her reassignment did not violate the ADA, see ECF 63-1 at 31–36; and (2) Plaintiff cannot make out

a prima facie case that her reassignment was discriminatory because (a) there is no evidence that she was not selected for other roles because of unlawful discrimination, and (b) "Defendant had legitimate non-discriminatory reasons for reassigning her to the role of Director-Level Position B ████████" rather than the role of "Director of Professional Development Academics." ECF 63-1 at 36–39.

In her responses, Plaintiff failed to address either of the bases of her "discrimination in hiring" claim briefed by Defendant. Instead, Plaintiff's cross-motion/opposition seeks summary judgment for a disability discrimination claim predicated on Defendant's December 10, 2021 action, alternatively characterized at various points in the briefing as a "removal," a "transfer," a "suspension," and a "reassignment". Defendant has challenged Plaintiff's revised position as an impermissible attempt to amend her complaint at summary judgment. Thus, between Plaintiff's apparent abandonment of the pleaded bases for her "discrimination in hiring" claim and her apparently new articulation of a claim for disability discrimination, Defendant argues that it is entitled to summary judgment on Count II of Plaintiff's amended complaint. See ECF 71 at 17–18, 54.

Regarding the claim based on Defendant's alleged requirement of updated medical information prior to reassignment, Plaintiff makes no reference anywhere in her briefing to these allegations; thus, this Court finds that Plaintiff has abandoned her discrimination claim to the extent it relies on such allegations, and grants summary judgment to Defendant in this respect. *See Rodgers v. Eagle All.*, 586 F. Supp. 3d 398, 448–449 (D. Md. 2022) ("A plaintiff who fails to respond to an argument for summary judgment is deemed to have abandoned the claim.") (citing *Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010)); *Palazzo v. Bayview Loan Servicing LLC*, No. DLB-20-2392, 2024 WL 4361857, at *15 (D. Md. Sept. 30,

30

2024) ("When a court finds the plaintiff has abandoned a claim, the court may grant summary judgment on the abandoned claim.") (collecting cases), *aff'd on other grounds*, No. 24-2169, -- F.4th --, 2026 WL 784984 (4th Cir. Mar. 31, 2026).

In fact, Plaintiff commits only two paragraphs in her cross-motion/opposition to respond to Defendant's request for summary judgment on her disability discrimination claim. Within those two paragraphs, the first is devoted entirely to her new theory regarding the December 10, 2021 "transfer." The only statements Plaintiff makes (with no citations to the record) that pertain to the other expressly pleaded bases for her discrimination in hiring claim are the following:

> The 444-day exclusion from the workplace—found improper by the Maryland State Board of Education—constituted significant harm to career progression even under pre-*Muldrow* standards. When finally placed, Plaintiff was given the only Director position without supervisory responsibilities. The rescission of the Director of Professional Development offer, coupled with the subsequent appointment of another candidate to that position, demonstrates unwillingness to accommodate Plaintiff's disability. Comparator evidence shows Plaintiff was treated less favorably than similarly situated employees without disabilities. These disputed facts preclude summary judgment.

ECF 65-1 at 36–37. It is not clear whether Plaintiff is necessarily responding to Defendant's arguments regarding these events or citing them as harms that flowed from the event she is now seeking to predicate her claim on—the December 10, 2021 "removal." But even if treated as a reference to her "discrimination in hiring" claim as pleaded in her amended complaint, this single paragraph—which essentially just restates the allegations in her amended complaint (see ECF 22 ¶¶ 96, 99–102, 105, 106, 119–23, 141, 146–48) with no evidentiary support—is too fleeting a discussion to sustain her claim against Defendant's summary judgment motion. *See Palazzo*, 2024 WL 4361857, at *15–16 (collecting cases) ("The party opposing summary judgment must say more than merely passing remarks in support of his position."). Thus, this Court concludes that Plaintiff has also effectively abandoned her claims of discrimination in Defendant's identification

of and placement in a new position; it will grant summary judgment to Defendant on Count II in this respect as well. Notably, even after Defendant highlighted that Plaintiff had not challenged its arguments regarding the "Discrimination in Hiring" claim, see ECF 71 at 54, Plaintiff did not, in her reply, attempt to revive a dispute as to those theories. Essentially, Plaintiff appears to have decided, at the summary judgment stage, to rest her disability discrimination claim entirely on alleged discrimination on December 10, 2021.[13]

But as to that claim, Defendant is correct that "[a] plaintiff may not amend her complaint through argument in a brief opposing summary judgment." *Barclay White Skanska, Inc. v. Battelle Mem'l Inst.*, 262 F. App'x 556, 563 (4th Cir. 2008) (quoting *Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1315 (11th Cir. 2004)). And the legal authority that Plaintiff cites in support of her assertion of this variation of her disability discrimination claim at this stage arose in distinct procedural contexts from that here.

First, in presenting her December 10, 2021 discrimination claim for the first time in her cross-motion, Plaintiff invokes *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 594 (4th Cir. 2012), in which, she avers, the Fourth Circuit held that "EEOC charges are liberally construed to encompass claims 'reasonably related' to the charge that 'can be expected to follow from a reasonable

---

[13] Lending support to this conclusion, Plaintiff's statements of her claims at the opening and closing of her cross-motion make no mention of her pleaded discrimination in hiring claims. *See* ECF 65-1 at 4 ("The undisputed facts establish that Defendant failed to accommodate Plaintiff's known disability for six months due to its own administrative error, *discriminated against her by removing her from her Director position one day after she complained about accommodation violations,* and retaliated against her for asserting her ADA rights.") (emphasis added); *id.* at 37 ("The undisputed facts establish that Defendant failed to provide reasonable accommodations during the November 2020 through June 2021 period, *discriminated against Plaintiff by subjecting her to an unlawful transfer in December 2021* under *Muldrow,* 601 U.S. 346 (2024), and retaliated against Plaintiff for engaging in protected activity.") (emphasis added); *id.* ("Plaintiff respectfully requests that this Court: 1. GRANT Plaintiff's Cross-Motion for Summary Judgment as to Court 1 (November 2020-June 2021 period), *Count II (December 2021 transfer)*, and Count III (Retaliation)" (emphasis added).

administrative investigation,'" ECF 65-1 at 26, to argue that "[a]ny reasonable investigation of Plaintiff's charges—detailing discrimination based on disability, the December 2021 reassignment, and barriers to obtaining new positions—would necessarily encompass the unlawful transfer itself. Count II properly includes the December 2021 transfer." ECF 65-1 at 26. However, the standard announced in *Sydnor* compares a claim brought in court to a charge originally filed with the EEOC, and is relevant to an analysis of whether a plaintiff has exhausted administrative remedies before an administrative body. *See Sydnor*, 681 F.3d at 594. That is an entirely separate question from the one at issue here, which is whether, at summary judgment, a plaintiff can advance, for the first time, a new variation of her originally pleaded claim.

Second, in her reply, Plaintiff, on the one hand, argues that "[c]hallenging both the reassignment and the hiring process for the new role is not a constructive amendment—it represents an alternative legal theory for a unified discriminatory course of conduct based on the same core operative facts," ECF 73 at 39, and on the other, seems to acknowledge amendment but states that "the critical inquiry is whether amendment would prejudice the defendant, not whether the legal theory precisely matches the initial pleading." ECF 73 at 38. This contradiction is further indicated by her almost exclusive citation, in opposing Defendant's "constructive amendment" argument, to the Fourth Circuit's decision in *Laber v. Harvey*, 438 F.3d 404 (4th Cir. 2006) (en banc). In that case, the court reviewed the district court's denial of the plaintiff's motion for reconsideration and leave to amend after summary judgment had been granted. It held that denial of the motions was an abuse of discretion because plaintiff "did not act in bad faith, his proposed amendment would not cause any prejudice to the [defendant], and the proposed amendment is not futile." *Laber*, 438 F.3d at 410. Plaintiff here argues that because Defendant would not be prejudiced by her "alternative theory for recovery," that, "[u]nder *Laber*, Defendant's constructive

amendment argument must fail." ECF 73 at 40. However, *Laber* did not deal with constructive amendment at all; it was specifically weighing the merits of a motion to amend, which Plaintiff has not filed here. Thus, the standards articulated and applied in *Laber* are inapposite.

Plaintiff argues that her Amended Complaint contained various allegations about what happened on December 10, 2021, including reference to it as "a discriminatory and retaliatory transfer that severely disadvantaged Plaintiff and caused harm to her employment." ECF 22 ¶ 117. That point is well taken—Plaintiff does not here seek to advance new factual allegations. But a single reference to an event as "discriminatory" where (1) Count II is entitled "discrimination in hiring" and expressly sets forth other specific alleged discriminatory acts and (2) Count III expressly ties her retaliation claim to the December 10, 2021 transfer does not suffice to provide fair notice that Plaintiff intended to assert a "discrimination in hiring" claim as to the events of December 10, 2021 (when no "hiring" occurred). And the applicable standard is higher than "fair notice" at the summary judgment stage. *See Barclay White Skanska, Inc.*, 262 F. App'x at 563 ("Efficiency and judicial economy require that the liberal pleading standards under *Swierkiewicz* and Rule 8(a) are inapplicable after discovery has commenced. At the summary judgment stage, the proper procedure for plaintiffs to assert a new claim is to amend the complaint in accordance with Fed. R. Civ. P. 15(a).") (quoting *Gilmour*, 382 F.3d at 1315).

Finally, the introductory paragraph of Count II, through which Plaintiff argues that Count II "expressly incorporates by reference all factual allegations . . . , including extensive details of the December 10, 2021 transfer," ECF 65-1 at 26, does not lead this Court to a different conclusion. The first paragraph of Plaintiff's pleaded "discrimination in hiring" count states that she "re-alleges and incorporates by reference the previous averments, and the paragraphs, *infra*, into this count as though fully set forth herein," but the paragraph continues, "and further alleges that Defendant

34

discriminated against her by making her hire into a new position contingent upon her disability and by," followed by Plaintiff's allegations of discrimination in the hiring process and her ultimate placement in a new position. ECF 22 ¶ 138. The latter portion of this paragraph, thus, appears to clarify the scope of the count, just as the first paragraph of Plaintiff's retaliation count did in re-alleging and incorporating the previous allegations before "further alleg[ing] that Defendant retaliated against [Plaintiff] by placing her on a suspension under the guise of a transfer," ECF 22 ¶ 149. In other words, the Amended Complaint expressly tied the retaliation count to the events of December 10, 2021 before making additional express allegations pertaining to those events. The "incorporating" paragraph of Count II of the amended complaint is an insufficient basis upon which to conclude, in the face of Defendant's challenge, that Plaintiff's amended complaint raised a disability discrimination claim based on the December 10, 2021 action. *See James v. Nalley BMW of Decatur*, No. 1:18-cv-03216-TWT-LTW, 2020 WL 13664375, at *4 (N.D. Ga. Feb. 19, 2020), *report and recommendation adopted sub. nom*, *James v. Asbury Auto. Atlanta, LLC*, No. 1:18-CV-3216-TWT, 2020 WL 13664284 (N.D. Ga. Mar. 12, 2020) ("Plaintiff may try to argue the allegations regarding his resignation are incorporated by reference into each of his claims, because he attempted to 'incorporate[]' every factual allegation into every claim," "[b]ut the liberal pleading standard 'does not require that, at the summary judgment stage, defendants must infer all possible claims that could arise out of facts set forth in the complaint.'") (quoting *Gilmour*, 382 F.3d at 1315).

Beyond the allegations in the Amended Complaint, a review of the record at summary judgment reflects little indication that Plaintiff intended to pursue a discrimination claim based on the December 10, 2021 events. Exchanges during the three depositions taken during discovery in this case indicate that Plaintiff—and Plaintiff's counsel—considered the events of December 10,

2021 to be the basis for her retaliation claim, rather than her discrimination claim. First, in Plaintiff's deposition, when asked by her counsel why she brought her lawsuit, Plaintiff said, *inter alia*:

> My civil rights and my civil liberties were violated. . . . I never thought . . . I would be in a space where someone was allowed to say I was a poor performance and the only thing that I received to date from – only thing I received was something that was written after I filed my complaints. . . . I shouldn't have been in a space where . . . my white male chief , because he was chief, could say I was a poor performer and not have any evidence of such after reporting him on several occasions.

ECF 63-3 (Pl. Dep.) at 312–13. Plaintiff's repeated reference to the December 10, 2021 action being taken in response to her reporting Chief HCO is consistent with the retaliation claim that she specifically pleaded in Count III. Further, the following exchange from the deposition of Chief HCO , taken on May 21, 2025, clearly ties the December 10, 2021 action to Plaintiff's retaliation claim, but makes no express mention of a discrimination claim based on those events:

> [Plaintiff's Counsel:] How do you respond to the claim of [Plaintiff] that you retaliated against her for filing EEO complaints by transferring her?
>
> [Defendant's Counsel:] Objection. You may answer, if you can.
>
> [Chief HCO :] Which claim are you referring to? The only time I ever learned of such a claim is by e-mail on December 9, 2021.
>
> [Plaintiff's Counsel:] Are you aware of the substance of this lawsuit?
>
> [Chief HCO :] I'm aware that [Plaintiff] is claiming that the district violated her accommodations.
>
> [Plaintiff's Counsel:] Okay. Are you aware that she's also claiming that her transfer – transfer out of the director role was retaliatory**?**

ECF 63-5 at 132–33. Finally, in the September 25, 2025 deposition of Dr. Santelises, while Plaintiff's counsel did ask Dr. Santelises whether, if she "believe[d] that a transfer would be done, or was being done for a retaliatory or discriminatory reason," she could stop that transfer, ECF 63-10 at 13, Plaintiff's counsel later asked, in apparent reference to the substance of the lawsuit, "Are

36

you at all concerned about your legacy in relation to this case and you know, failure to accommodate and potential retaliation happening under your leadership of the school system?" ECF 63-10 at 119.

In addition, the summary of Plaintiff's December 22, 2021 interview during the EEO investigation lists, under "Basis for Disability Discrimination: "[1] Every task assigned to [Plaintiff] violated her accommodations[;] [2] Accommodations were not being honored by Chief HCO [;] [and] [3] Told by Chief HCO that she must 'direct herself.'" ECF 63-27 at 7. Later, in elaborating on why Chief HCO was identified as a "Discriminatory Actor," this document says, "[1] The bulk of allegations are against Chief HCO[;] [2] Consistent violation of ADA accommodations[;] [3] Relied on his position as Chief to not follow polices/procedures [sic][;] [4] Retaliated against her after she spoke with Dr. Santelises." *Id.* Thus, in this interview, Plaintiff apparently did not allege that the December 10, 2021 action was, itself, discriminatory, as opposed to retaliatory.

Overall, the summary judgment record does not change this Court's assessment that Plaintiff's introduction of the December 10, 2021 action as an "alternative" basis for her disability discrimination claim under Count II of her amended complaint is an improper amendment of her pleading. *See Laber*, 438 F.3d at 413 n.3 (concluding that plaintiff had not sufficiently put his employer's alleged discrimination at issue, in part because "[o]ther documents in the record" demonstrated that "[n]ot once before the district court's grant of summary judgment did [plaintiff] attempt to disabuse either [his employer] or the district court of any alleged misunderstanding of his religious discrimination claim."). A cross-motion for summary judgment is not the proper vehicle by which to amend. *See Allegis Grp., Inc. v. Bero*, 689 F. Supp. 3d 81, 142 (D. Md. 2023) ("[T]he Fourth Circuit has made clear that the only way to raise new claims after discovery has

begun is through amendment of the complaint.") (citing *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 617 (4th Cir. 2009)), *aff'd*, No. 23-2023 (4th Cir. July 29, 2025) (unpublished per curiam). Because Plaintiff has not established a genuine issue of material fact as to her pleaded discrimination in hiring claims, Defendant's motion for summary judgment will be granted as to Count II and Plaintiff's cross-motion will be denied.

## C. Retaliation

Plaintiff's final claim is that Defendant retaliated against her for "seeking reasonable accommodations, advocating for her supervisor to follow her accommodations, and filing informal and formal EEO complaints." ECF 22 ¶ 150. As summarized by the Fourth Circuit, the ADA retaliation standard is as follows:

> Under 42 U.S.C. § 12203, "[n]o person shall discriminate against any individual because such individual has opposed any act or practice *made unlawful by this chapter* or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." (emphasis added). In order to establish a prima facie case of retaliation, a plaintiff must allege (1) that she has engaged in conduct protected by the ADA; (2) that she suffered an adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal link between the protected activity and the adverse action. *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001). In reviewing retaliation claims, courts recognize the need to balance the desire to encourage employees to oppose unlawful discrimination, with "an employer's interest in maintaining a harmonious productive and loyal workforce." *Fitch v. Solipsys Corp.*, 94 F. Supp. 2d 670, 678 (D. Md. 2000).

*Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002). "Courts typically apply the standards for Title VII retaliation claims to ADA retaliation claims." *Parker v. Children's Nat'l Med. Ctr., Inc.*, No. ELH-20-3523, 2021 WL 5840949, at *23 (D. Md. Dec. 9, 2021) (citing *Laird v. Fairfax Cnty.*, 978 F.3d 887 893 n.5 (4th Cir. 2020); *S.B. ex rel. A.L. v. Bd. of Educ. of Hartford Cnty.*, 819 F.3d 69, 78 (4th Cir. 2016); *Rhoads v. F.D.I.C.*, 257 F.3d 373, 391 (4th Cir. 2001)). "Therefore, '[i]n order to prevail on a claim of retaliation [under the ADA], a plaintiff must

either offer sufficient direct and indirect evidence of retaliation, or proceed under [the *McDonnell Douglas*] burden-shifting method.'" *Id.* (quoting *Rhoads*, 257 F.3d at 391) (alteration in *Parker*). Each element of a prima facie case is addressed below.

### 1. Conduct Protected by the ADA

As protected conduct, Plaintiff rests her retaliation claim on her "complain[ts] about accommodation violations on August 5, October 15, October 28, and December 9, 2021." ECF 65-1 at 30.[14] Defendant has not disputed the "protected conduct" element of Plaintiff's prima facie case in its filings. Thus, Plaintiff has adequately demonstrated this element of her prima facie case.

### 2. Adverse Action

As for the second element—adverse action—it is useful first to outline the actions that Plaintiff, *at summary judgment*, is alleging as adverse actions for purposes of her retaliation claim. In her amended complaint, Plaintiff expressly alleged that Defendant took the following actions in retaliation against her engaging in protected activity:

(1) "failing to follow its own regulations, rules, and policies regarding the Plaintiff" (ECF 22 ¶ 152);

(2) removing Plaintiff from her position as Director—Educator Pipeline and Induction on December 10, 2021 and thereby "transferring" her into a "non-position" while awaiting reassignment (ECF 22 ¶¶ 154–156, 158);

---

[14] Plaintiff also cites her first reasonable accommodation request in November/December, 2020 as an example of protected conduct, ECF 65-1 at 5, 30, but does not make any argument that Defendant retaliated against her for that request. In addition, Plaintiff noted in her "Retaliation Timeline Overview" her formal request for *extension* of her ADA accommodations on December 1, 2021, *see* ECF 63-59, ECF 65-1 at 5; however, she has not attempted to argue that Defendant retaliated against her for this request, either. Finally, she cites her December 9, 2021 statement to Chief HCO that their email interaction "feels abusive and grounded in retaliation," ECF 63-54 at 2, as an "activit[y] . . . protected under the ADA." ECF 65-1 at 30. This statement, which makes no reference to her disability or her accommodations, cannot fairly be read to suggest or refer to opposition to any discriminatory activity such that would render the statement "protected conduct" for purposes of Plaintiff's prima facie case.

(3)  improperly vesting **Chief HCO** with the right to transfer Plaintiff (*Id.* ¶ 157);

(4)  alleging to EEO investigators that Plaintiff had inadequate job performance (*Id.* ¶ 153);

(5)  conditioning Plaintiff's placement in a new position on her providing medical documentation (*Id.* ¶ 159); and

(6)  ultimately placing Plaintiff in an "ad hoc position without job security, terms, conditions, or privileges of her previous employment" (*Id.* ¶ 161).

Defendant, in its motion for summary judgment, only expressly challenges the "adverse" nature of the third and sixth alleged actions in the above list, arguing, respectively, that **the Chief HCO** had the authority to internally transfer employees pursuant to administrative regulation and that Plaintiff's new position pays her the same salary and has "significant responsibilities and requires a substantial number of essential functions." ECF 63-1 at 42–43.

Plaintiff opposes Defendant's arguments in a single two-sentence paragraph, arguing that "[t]he one-day temporal proximity, pattern of escalating adverse treatment, shifting justifications, policy violations, lack of formal discipline, and disparate treatment of comparators create genuine issues of material fact." ECF 65-1 at 36. While Plaintiff identifies no particular adverse action, her reference to "one-day temporal proximity" echoes her argument that the December 10, 2021 removal was adverse.

In fact, in Plaintiff's cross-motion, she narrows the list of actions that she is asserting were "adverse" for purposes of her retaliation claim to the following: (1) the December 10, 2021 reassignment which she asserts had the effect of a suspension; (2) the restriction of her access to email and other internal systems; and (3) the rescission of an offer made to her in September 2022

for the Director of Professional Development Academics position. ECF 65-1 at 30.[15] The rest of Plaintiff's briefing of her retaliation claim (discussing causation, pretext, and "Comparators and Performance Justifications") pertains to the December 10, 2021 action only. While the restriction of her access to internal systems may have coincided with her removal, she makes no other mention of this action in briefing her retaliation claim. Further, regarding the rescission of the job offer made to Plaintiff in September, 2022, Plaintiff has not, in her cross-motion, identified any protected activity other than her actions before the December 10, 2021 removal. Thus, while this Court understands that the rescission of the job offer made to Plaintiff in September, 2022 *extended* the length of the "constructive suspension" effectuated by the December 10, 2021 removal, it does not find that Plaintiff has effectively asserted the rescission as a discrete adverse action with a sufficient causal connection to her much earlier protected conduct. Thus, for Plaintiff's retaliation claim, the December 10, 2021 removal is the sole adverse action in dispute.

Notably, the extent of Plaintiff's argument as to the adversity of this action is a short invocation of the standard for the requisite "material[] advers[ity]" in retaliation claims: "These actions 'might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" ECF 65-1 at 30 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). Notwithstanding her sparse argument, this Court finds that Plaintiff has created a genuine dispute of material fact as to whether the December 10, 2021 removal was an "adverse action."

Defendant argues that because, between her removal and ultimate placement in a new role, Plaintiff "continued to receive all of her employment benefits—including her full salary," ECF 71

---

[15] Plaintiff also asserts that she "lost PSASA affiliation[] [and] award winner designation"; however, these harms stem from the December 10, 2021 action and relate to a determination of "material[] advers[ity]" of the action. ECF 65-1 at 30; ECF 71 at 44.

at 44 (citing ECF 63-3 (Pl. Dep.) at 82–83)), and because Defendant "worked diligently" to identify a position to place her in, that she has failed to adduce evidence that this action was "materially adverse." This Court is not convinced. It agrees with Plaintiff that the action taken on December 10, 2021 amounted to either a suspension or placement on administrative leave, though with pay. The fact of a suspension being with pay does not, by definition, preclude a finding that the action was materially adverse. *See Hawkins v. Leggett*, 955 F. Supp. 2d 474, 488 (D. Md. 2013) (ruling that the plaintiff had created a triable issue regarding material adversity where he had been placed on administrative leave for more than six months because, while he received full pay, he could not earn overtime or holiday pay.), *aff'd sub. nom*, *In re Canarte*, 558 F. App'x 327 (4th Cir. 2014) (unpublished per curiam); *Blakes v. City of Hyattsville,* 909 F. Supp. 2d 431, 441-42 (D. Md. 2012) (holding that a reasonable juror could conclude that a suspension with pay was materially adverse because "[a] reasonable person might well be dissuaded from filing a charge of discrimination due to, for instance, the loss of prestige, privileges, and respect that may accompany a suspension. This concern figures to be especially sensitive where, as here, the employee . . . , inferably, boasts a strong track record of performance.").

Here, Plaintiff has adduced sufficient evidence, through her deposition testimony, for a reasonable juror to conclude that her suspension, even with pay, could constitute a materially adverse action. But more than anything, the length of time that Plaintiff was without a position is telling. Plaintiff has provided a February 28, 2023 MSBE Order in which MSBE found that where, at the time, Plaintiff's "transfer to another position ha[d] been on hold for 14 months, over two school years," Defendant had "exceed[ed] the limits of the local Superintendent's authority to place a transferred employee." ECF 63-9 at 1. While MSBE did not, itself, characterize the holding pattern in which Plaintiff had been left as "administrative leave" or a "constructive suspension," it

42

implicitly recognized that Plaintiff's status could *not* be characterized as a "reassignment," which is how the action was initially presented to Plaintiff. ECF 63-9 at 1 ("Implicit in our decisions is the principle that a reassignment involves the transfer of an employee from one position *to another position*.") (emphasis added). A reasonable juror could readily conclude that Defendant took a materially adverse action against Plaintiff.

### 3. Causation

The remaining question for Plaintiff's *prima facie* case is whether she has put forward sufficient evidence to sustain a reasonable finding that Defendant removed Plaintiff from her position on December 10, 2021 in retaliation for Plaintiff's protected activity. The parties have briefed two theories of causation, which this Court will address in turn. Plaintiff has first asserted that her removal on December 10, 2021, just one day after she filed her EEO complaint forwarding that day's email exchange with the Chief HCO to the EEO unit, was so close in temporal proximity as to demonstrate the requisite causal connection. ECF 65-1 at 20, 30–31. The Fourth Circuit has stated that "[i]n retaliation cases, temporal proximity suggests a correlation between an employee's protected action and his employer's adverse reaction." *Kelly v. Town of Abington*, 90 F.4th 158, 170 (4th Cir. 2024); *see also Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 126 (4th Cir. 2021) ("[A] causal connection for purposes of demonstrating a *prima facie* case exists where the employer takes adverse employment action shortly after learning of the protected activity.") (quoting *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004)). However, Plaintiff's theory fails for the simple reason that she has not adduced sufficient evidence that the Chief HCO was aware of her December 9, 2021 complaint to the EEO unit when he effectuated the adverse action. The Fourth Circuit requires actual knowledge by the decisionmaker, not constructive knowledge imputed from other employees' knowledge; if the "decisionmaker is unaware of any prior

complaints, a plaintiff 'cannot establish the necessary causal connection.'" *Roberts*, 998 F.3d at 123–26 (rejecting Title VII retaliation claim by a former employee who complained about sexual harassment to his supervisors but not to the CEO who terminated him); *see also Strothers v. City of Laurel*, 895 F.3d 317, 335–36 (4th Cir. 2018) ("An employee may satisfy [her] burden simply by showing that (1) the employer either understood or should have understood the employee to be engaged in protected activity and (2) the employer took adverse action against the employee *soon after becoming aware of such activity*.") (emphasis added); *Jennings v. Frostburg State Univ.*, 679 F. Supp. 3d 240, 281 (D. Md. 2023) ("The Fourth Circuit has made clear that to establish a causal relationship between the protected activity and the adverse action, 'a plaintiff must show that the decisionmaker was aware of the protected activity at the time the alleged retaliation occurred.'") (quoting *Roberts*, 998 F.3d at 124).

Plaintiff argues that because the Chief HCO was a participant in the email exchange that Plaintiff subsequently forwarded to the EEO, "[a] reasonable jury could infer that the Chief HCO , as the author and recipient of these emails, recognized their content related to accommodation compliance." ECF 75 at 15. But the fact that the Chief HCO was on the thread that Plaintiff subsequently forwarded to the EEO does nothing to establish his knowledge.

Alternatively, Plaintiff argues that "Defendant's assertion of lack of knowledge is precisely the type of disputed fact that precludes summary judgment when supported by circumstantial evidence of awareness." ECF 73 at 16. Plaintiff's suggestion that the Chief HCO's lack of knowledge of Plaintiff's December 9, 2021 complaint to the EEO unit "creates, rather than resolves, a genuine dispute of material fact," *id.* at 15, indicates a misunderstanding of her ultimate burden to show each element of her case by a preponderance of the evidence. With Defendant having offered evidence that the Chief HCO had no knowledge, it is Plaintiff's burden to create

44

a genuine dispute by adducing evidence from which a reasonable factfinder could conclude that he possessed such knowledge. However, the evidence that Plaintiff cites only supports a finding that she forwarded the December 9, 2021 email exchange to Mr. Calhoun the day before the adverse action; it offers nothing regarding the Chief HCO's awareness.

Plaintiff next cites, as circumstantial evidence of causation in the events of December 9 and 10, 2021, the events of August 5, 2021. By Plaintiff's telling, on that day, "Plaintiff complain[ed] to EEO about accommodation violations; the same day, the Chief HCO email[ed] questioning her 'fit' for the position." ECF 73 at 16 (citing ECF 65-6 at 5–6, ¶¶ 26–29; ECF 63-16 at 5; and ECF 63-57 (EEO Report) at 6–7). Plaintiff argues that the events of August 5, 2021 thus are evidence of an "established pattern" of retaliation closely following protected conduct, into which the events of December 9 and 10, 2021 fall. But this argument misrepresents the record, which actually reflects that the Chief HCO's August 5 statement regarding "fit" ("We should have a conversation about whether you believe this role and team are the right fit for you") came before Plaintiff submitted her EEO complaint. *See* ECF 65-6 ¶¶ 29 ("On August 5, 2021, [Plaintiff] contacted Jane Ehrehfeld, to state that the Chief HCO's response to her e-mail was aggressive and neglectful of her accommodations, and forward the e-mail chain . . . ."); ECF 63-57 (EEO Report) at 7 (describing Plaintiff's complaint to Ehrenfeld that "the Chief HCO's response neglected her accommodations"). In light of the above, this Court cannot conclude that a reasonable juror, from the evidence presented, could find that Plaintiff was removed from her position in retaliation for her December 9, 2021 complaint to the EEO unit, specifically.

As an alternative theory of causation, Plaintiff argues that "[t]he intervening period between [the] June 2021 accommodations and December 2021 reassignment demonstrates escalating retaliatory animus," and that retaliation can be inferred from a "pattern of escalating

adverse treatment" following protected activity. ECF 65-1 at 31 ("quoting" *Nita H. v. Frederick Cnty. Pub. Sch.*, No. AW-13-3499, 2014 WL 3788011, at *6–8 (D. Md. July 31, 2014)).[16] Between her cross-motion and her reply, however, Plaintiff seemingly abandoned the "intervening period" theory—the phrase does not appear in her reply—relying solely on a theory of a "pattern of escalating adverse actions." ECF 73 at 17–18.[17] Specifically, Plaintiff cites the following as instances of "escalating retaliatory conduct where each protected complaint was followed immediately by adverse action":

(1) August 5, 2021 – Plaintiff asserts that, on the same day she filed her first formal complaint to the EEO unit regarding accommodation violations, ▮the Chief HCO▮ ▮▮ emailed Plaintiff questioning her "fit" for her position ("the first time he expressed any performance concerns"). ECF 65-1 at 31; ECF 73 at 17 (citing ECF 63-57 (EEO Report) at 6–7);

(2) November 8, 2021 – Plaintiff asserts that, during her meeting with ▮the Chief HCO▮ ▮▮, he "stated her accommodations were being violated by 'repeatedly giving her work with deadline demands,'" but told her that the accommodations were "'guiding principles' to be followed only 'to the extent possible,'" and that she "needed to be 'more flexible' rather than insisting on adherence to approved

---

[16] This "quote" and "citation" were one of a number of issues previously raised to Plaintiff's counsel in this Court's March 12, 2026 Letter Order. ECF 75. In light of the fabricated citation, this Court has sufficient cause, in its discretion, to decline to consider the proposition purportedly drawn from "*Nita H.*," for which Plaintiff cites no other case in either its cross-motion or its reply. However, the point is moot because, as discussed *infra*, even if this Court were to accept Plaintiff's argument based on the fabricated citation, Plaintiff still has not adequately shown causation.

[17] Under the "intervening period" theory of causation, where "temporal proximity between protected activity and allegedly retaliatory conduct is missing, courts may look to the intervening period for other evidence of retaliatory animus." *Lettieri v. Equant, Inc.*, 478 F.3d 640, 650 (4th Cir. 2007) (quoting *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3d Cir. 2000)). In her reply, Plaintiff, confusingly, takes issue with Defendant having argued the "intervening period" theory on the terms defined by Plaintiff in her cross-motion. That is, while Plaintiff originally referred to "the intervening period between June 2021 accommodations and December 2021 reassignment," in her reply, she says that "Defendant's focus on 'July 2021' as the relevant date misapprehends the nature of the protected activity. The protected conduct is not merely 'having accommodations'—it includes complaining about accommodation violations." ECF 73 at 17. Plaintiff's position is contradictory and may be a tacit acknowledgment of the peculiarity of an argument regarding an "intervening period" bounded, on the front end, not by the employee's request for, but by the *employer's grant* of accommodations as the alleged "protected conduct."

accommodations"; Plaintiff reported these remarks to the EEO unit. ECF 65-1 at 31; ECF 73 at 17 (citing ECF 63-31 at 2; ECF 63-6 at 2);

(3) December 9 and 10, 2021 – Plaintiff asserts that the Chief HCO "responded to Plaintiff's advocacy by stating that her "continued questioning of a decision that the chief officer has made is itself significant evidence of the problem with fit and performance"; Plaintiff forwarded this email exchange to the EEO unit and her reassignment was announced one day later. ECF 65-1 at 17; ECF 73 at 17–18 (citing ECF 63-53 at 2–7; ECF 63-31 at 2; ECF 65-55).

As already discussed, Plaintiff's assertions regarding the events of August 5, 2021 materially misrepresent the record. ECF 71 at 47. the Chief HCO's remark regarding Plaintiff's "fit" did not come after she had filed her EEO complaint on that day; rather, it was this email from the Chief HCO that Plaintiff provided to the EEO unit with her first formal complaint. *See* ECF 63-45 at 3. Thus, the remark, even if considered an "adverse action," cannot be considered to have been in retaliation for Plaintiff's filing of her EEO complaint.

As for the events of December 9th and 10th, this Court has already found, for reasons stated above, that the Chief HCO's lack of knowledge of Plaintiff's December 9th complaint to the EEO unit precludes a finding that her removal was in retaliation for that complaint.[18] To the extent that Plaintiff is arguing that the Chief HCO's statement regarding "the problem with fit and performance" was made with retaliatory animus in response to Plaintiff's advocacy, Plaintiff's "advocacy" did not touch upon her disability or accommodations; rather, the exchange reflects Plaintiff advocating for her inclusion at leadership meetings, "for [her] salary and union based on updated information and as an African American woman," for her to have "representation in the

---

[18] Also, this Court notes that an exhibit attached to Defendant's reply may contradict Plaintiff's assertion that she forwarded Mr. Calhoun the December 9 exchange *including* the Chief HCO's statement about "the problem with fit and performance." The exhibit indicates that the exchange was brought to Mr. Calhoun's attention sometime before 1:34 P.M. (at which time Mr. Calhoun forwarded it to himself); Chief HCO's statement was made in an email sent at 3:06 P.M. *Compare* ECF 63-53 at 2 *with* ECF 71-3 (Ex. 74).

47

room" at the December 10th meeting, and for input regarding the individuals invited to attend that meeting. Thus, Plaintiff's statements in the email thread cannot be reasonably read as "protected conduct" such that a reasonable factfinder could conclude that the Chief HCO's statements, or Plaintiff's removal the following day, constituted retaliation for protected conduct.

That leaves the November 8, 2021 meeting between Plaintiff and the Chief HCO, which the undisputed record reflects was intended to feature a discussion of Plaintiff's accommodations. *See* ECF 63-50. However, there is some inconsistency in Plaintiff's characterization of statements purportedly made at the meeting. Plaintiff has not cited to any record evidence for her assertion that the Chief HCO told her she needed to be "more flexible." And certain of the statements regarding violations that she attributes to the Chief HCO she alternatively attributes to herself in other filings. [19] While, in a December 22, 2021 interview, the Chief HCO apparently characterized Plaintiff's accommodations as "something that should be complied with 'to the extent possible' and that the accommodations were 'guiding principles,'" ECF 63-6 at 2, nothing in this document suggests that these sentiments, as quoted, were conveyed to Plaintiff at the November 8, 2021 meeting.

In her *reply* to her cross-motion for summary judgment, Plaintiff first argues that "even if the Chief HCO lacked knowledge of the December 9 EEO forwarding, temporal proximity

---

[19] For example, Plaintiff asserts that "[d]uring the November 8, 2021 accommodation check-in, [she] reported to Calhoun that the Chief HCO stated her accommodations were being violated by 'repeatedly giving her work with deadline demands.'" ECF 65-1 at 8–9 (quoting ECF 63-31 at 2)); *see also* ECF 73 at 17. However, review of the cited exhibit, ECF 63-31 (a "Timeline Summary" prepared by Mr. Calhoun on December 15, 2021) suggests that the quoted language may have been a representation that *Plaintiff* made to Mr. Calhoun in the course of a meeting with Calhoun in the Office of Legal Counsel. Indeed, later in her reply (in discussion of her discrimination claim), Plaintiff states that "Calhoun's ADA Timeline . . . documents the November 8 meeting where *Plaintiff* reported that her accommodations were being violated by 'repeatedly giving her work with deadline demands.'" ECF 73 at 27 (quoting ECF 63-31 at 2) (emphasis added).

analysis still applies to earlier protected activity"; specifically, her complaints filed with the EEO unit on August 5, October 15, and October 28, 2021. She asserts that the alleged violations underlying those complaints were discussed with the Chief HCO at their November 8, 2021 meeting, and that her removal, "32 days later[,] [was] well within the temporal proximity window established by Fourth Circuit precedent." ECF 73 at 15.

However, this argument suffers from the same defect as multiple others; namely, that it was not raised in Plaintiff's opposition to Defendant's motion for summary judgment. As discussed, while citing her August, October, and December, 2021 complaints about accommodation violations as her "protected activity," the only argument she made for causation based on temporal proximity was the "one-day temporal proximity" between her December 9, 2021 complaint and her December 10, 2021 removal, and her only reference to the November 8, 2021 meeting was for purposes of demonstrating retaliatory animus, based on a "quote" that Plaintiff subsequently abandoned.

Plaintiff's proposal, in her reply, to use the November 8, 2021 meeting as the "protected conduct" from which the period to be assessed for "temporal proximity" should run is not offered to *rebut* arguments specifically raised by Defendant in opposition to Plaintiff's cross-motion for summary judgment; rather, it is a new, alternative argument that Plaintiff invites this Court to credit in the event that her theory of "one-day temporal proximity" is rejected. "The ordinary rule in federal courts is that an argument raised for the first time in a reply brief or memorandum will not be considered." *Clawson v. FedEx Ground Package Sys., Inc.*, 451 F. Supp. 2d 731, 734 (D. Md. 2006). *See also Mackey v. Secure Evaluation and Therapeutic Treatment*, No. MJM-23-cv-02910, 2024 WL 4335687, at * n.8 (D. Md. Sept. 26, 2024) ("Because this argument does not appear to be directly responsive to arguments made in Plaintiff's opposition and is presented for the first

time in Defendants' reply, depriving Plaintiff of an opportunity to respond, the Court declines to consider it.") (citing *Clawson*); *CDC-LCGH, LLC v. Mayor and City Council of Baltimore*, No. WDQ-06-2235, 2007 WL 9728949, at *6 (D. Md. Jan. 29, 2007) (where motion to dismiss failed to address certain counts in amended complaint, and defendant argued for dismissal of these counts for first time in its reply, court denied the motion at to those counts, notwithstanding the fact that the plaintiff had not requested leave to file a surreply) ("Not requesting leave to file a surreply should not prejudice [plaintiff] against [defendant's] belated arguments . . . , which could and should have been raised in its motion and supporting memorandum."), *aff'd*, 313 F. App'x 637 (4th Cir. 2009) (unpublished per curiam). No circumstances are present here to warrant this Court departing from the ordinary rule.

This Court cannot hold that a reasonable factfinder could find Plaintiff to have demonstrated a prima facie case of retaliation by a preponderance of the evidence. Defendant's motion for summary judgment will be granted on this count, and Plaintiff's motion will be denied.

## IV.    CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment, ECF 63, will be granted in part and denied in part, Plaintiff's Motion for Summary Judgment, ECF 65, will be denied, and judgment will be entered in favor of Defendant on Plaintiff's discrimination and retaliation claims. Plaintiff's failure-to-accommodate claim will proceed to trial on both the delay and violation theories. A separate Order follows.

Dated: April 29, 2026                                                      /s/
                                                            Stephanie A. Gallagher
                                                            United States District Judge

50